IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMEKIA BRADLEY, | ) | Case No. 1:23-cv-00082 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

I.      **Introduction**

Plaintiff, Tamekia Bradley, seeks judicial review of the final decision of the Commissioner of Social Security, which denied her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act and for supplemental security income ("SSI") under Title XVI.  Bradley challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ failed to properly evaluate the opinions of one of Bradley's treating physicians.  She also contends that substantial evidence does not support the ALJ's residual functional capacity ("RFC") determination.  The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

Because the ALJ applied proper legal standards and reached a determination supported by substantial evidence, the Commissioner's final determination of Bradley's applications for DIB and SSI must be AFFIRMED.

## II.     Procedural History

Bradley filed applications for DIB and SSI on December 21, 2020.  (Tr. 74).  Her alleged disability onset date in both applications was December 31, 2017.  (Tr. 74).  Bradley's disability claims were based on alleged physical and mental conditions, including lumbar spondylosis, chronic low back pain, anxiety, major depressive disorder, and obesity.  (Tr. 74, 82, 90).

Bradley's applications for DIB and SSI benefits were denied both initially and upon reconsideration.  (Tr. 115, 120, 139, 149).  Bradley requested a hearing.  Administrative Law Judge ("ALJ") William Leland heard the matter on January 28, 2022 and denied the claims in a February 4, 2022 decision.  (Tr. 18–35).  In so ruling, the ALJ determined that Bradley had the residual functional capacity ("RFC") to perform work at the sedentary exertional level, except that:

> the claimant can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; frequently be exposed to humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat; has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to frequently interact with supervisors, coworkers, and the public.

(Tr. 26).

On December 22, 2022 the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–4).  On January 17, 2023, Bradley filed a complaint to obtain judicial review.  (ECF Doc. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Bradley was born in 1975 and was 42 years old on the alleged onset date, December 31, 2017.  (Tr. 33).  Bradley received a high school education and had past relevant work as an airline security representative.  (*Id*.).

#### B.    Medical Evidence

On October 9, 2018, Bradley sought treatment from nurse practitioner Amy Firrell for bilateral foot pain.  (Tr. 372–75).  N.P. Firrell assessed that Bradley was alert and in no distress. (Tr. 374).  She had normal gait and range of motion, and her pulmonary and chest examinations were also normal.  (Tr. 374–75).  Bradley's mood and affect were assessed as normal, but she was prescribed Lexapro for anxiety and depression.  (Tr. 375).  She was advised to use good shoes and lose weight to address pain in her right foot.  (*Id*.).  Additionally, Bradley was prescribed medication for asthma.  (*Id*.).

On September 17, 2019, Bradley sought treatment from nurse practitioner, Linda Bartko. (Tr. 363–67).  Bradley stated that she had stopped taking her Lexapro because she felt it was not beneficial.  (Tr. 364).  She expressed she previously worked at the airport but quit due to the stress of the job and because the job was a reminder of a friend who died by suicide in 2016. (*Id*.).  She stated that since the death of her friend she did not like to engage in activities, that she became anxious in crowds or in public, and that her mother was her "safe space."  (*Id*.).  On examination, Bradley was alert and in no acute distress, but she was tearful and emotional.  (Tr. 366).  She was reported as well-dressed, well-groomed, cooperative, and pleasant.  (*Id*.). Bradley's mood was described as depressed, but she had normal thought content and good insight and judgment.  (*Id*.).  Her gait was normal, and her lungs were clear.  (*Id*.).  N.P. Bartko

3

continued Bradley on asthma medications and started her on a prescription of Paxil for her depression, as well as referring her to the behavioral health department.  (Tr. 367).

On May 15, 2020, Bradley had an appointment with Brandon Fluker, CMA, for low back and leg pain via telehealth visit due to the COVID-19 pandemic.[1]  (Tr. 360–61).  Bradley described an instance, four days prior, when she was moving "heavy boxes" and soon thereafter experienced low back pain and bilateral leg pain.  (Tr. 360).  Bradley denied any weakness or numbness.  (Id.).  Bradley described that the pain was like a muscle cramp that worsened when she would bend over.  (Id.).  She expressed having pain when both sitting and at rest.  (Id.).  However, it was noted, on examination, that Bradley was seated, appeared well, and was not in any acute distress.  (Id.).  Mr. Fluker prescribed Ibuprofen and Flexeril for five days to address Bradley's acute low back pain with sciatica.  (Id.).

On May 27, 2020, Bradley saw nurse practitioner Kelly Burdsall related to her continued low back and leg pain.  (Tr. 356–60).  Bradley was well-appearing and alert, but she was in mild acute distress due to pain.  (Tr. 358).  Her gait was slow, but balanced, and she had a decreased range of motion in her back.  (Tr. 359).  Bradley was able to toe walk, heel walk, and weight bear on each leg individually.  (Id.).  X-rays of Bradley's back showed mild to moderate lumbar spondylosis.  (Id.).  She was ordered to bedrest for two or three days and prescribed a Medrol dose pack and a muscle relaxant.  (Id.).

---

[1]  There is a potential discrepancy in the ALJ's description of the May 15, 2020, appointment as to whether she was treated by a provider named Brandon Fluker (as stated in the ALJ decision) or one named Jaya Mehta during the telehealth visit (as described in the parties' briefing).  It appears that both providers signed off on the May 15th appointment notes, at 12:42 PM.  The court finds no issue with any potential misstatement in the ALJ decision as to who treated Bradley that day.  Both providers appear to have signed off on the appointment.  Bradley has not raised an issue of this apparent discrepancy, and the court won't create one.

On September 17, 2020, Bradley saw Augusto Hsia, MD, about her back pain.  (Tr. 352–56).  Before this appointment, Bradley was last treated by Dr. Hsia in 2013 for acute low back pain.  (Tr. 352).  Bradley's gait was antalgic, and she had decreased range of motion in her lumbar spine.  (Tr. 355).  However, she had normal strength in her lower extremities and normal sensation to touch.  (Tr. 354–55).  Dr. Hsia prescribed Lidocaine, Baclofen, and aquatic therapy. (Tr. 356).

On October 30, 2020, Bradley participated in a physical therapy evaluation with Ioanna Kendra Simon, PT.  (Tr. 348–51).  The physical therapist recommended seven visits and rated Bradley's prognosis as "good" due to her objective clinical presentation.  (Tr. 348–49).

On November 30, 2020, Bradley participated in her second physical therapy visit with Kerstin Schultz, PT.  (Tr. at 345).  She reported increased pain levels after a 13-hour drive.  (*Id*.).

On January 4, 2021, Bradley saw Jane D'Isa, DO, and reported anxiety and depression. (Tr. 342–45).  She stated that the Paxil and Lexapro previously prescribed did not help and said she "would like to be on disability for her asthma, back pain and depression."  (Tr. 342). Bradley was alert and in no acute distress, with normal gait and a normal pulmonary and chest examination.  (Tr. 343).  Her mood, memory, affect, and judgment were all normal.  (*Id*.).  Dr. D'Isa started Bradley on a prescription of Effexor for depression and refilled her asthma medications.  (Tr. 344).  Bradley was also referred to podiatry for foot pain and the spine center for her back pain.  (*Id*.).

On February 15, 2021, Bradley participated in a psychological consultative examination conducted by Hershel Pickholtz, EdD.  (Tr. 454–64).  Bradley stated that her "back problems since 2015" and bad panic attacks, depression, and asthma prevented her from working.  (Tr. 461).  Bradley reported living with her mother for her entire life and had no significant

behavioral health history. (Tr. 456). She was reported as neatly and appropriately dressed. (Tr. 459). Her tone of voice was somewhat depressed, and her motor activity appeared a little bit constricted, sluggish, slow, and depressed, but she was compliant throughout the evaluation. (*Id*.). Her verbalizations were logical, coherent, relevant, and goal directed, her overall affect appeared slightly constricted, and her mood appeared slightly depressed most of the time. (*Id*.). There were no other signs of autonomic activity. (*Id*.). Bradley stated that she had been depressed in the past because her friend committed suicide and she had some more recent deaths in the family, but that she was mostly depressed because her father passed away. (*Id*.). The quality and quantity of Bradley's responses throughout the clinical interview were noted as within the average range, while the quality and quantity of her responses during the cognitive section fell within the low average range. (Tr. 460). Bradley's long-term history recall was within average range, her overall ability to recall five objects after 20 minutes was within borderline range, her overall levels of intellectual functioning fell within the low average range. (*Id*.). Bradley's abilities for arithmetic computational capacities fell within the borderline low range and she was able to solve some single-digit addition, subtraction, and multiplication and some multi-operational math problems, she was able to recall four digits forwards and three digits backwards when presented with a sequence of numbers. (*Id*.). Her capacities to define words fell within the average range. (*Id*.). Based on Bradley's combined responses to the mental status operations and the descriptions of daily living activities, her estimated levels of intelligence fell within the low average ranges. (*Id*.). Dr. Pickholtz diagnosed Bradley with uncomplicated grief and unspecified anxiety disorder, both currently mild, and stated that he believed "she would improve with future psychiatric counseling and possibly some medications." (Tr. 462).

On March 11, 2021, Bradley saw Dr. D'Isa for a follow up appointment.  (Tr. 638–47).
Bradley was alert and in no acute distress, with normal gait, normal pulmonary and chest
examination, and normal mood, memory, affect, and judgment.  (Tr. 638).

On May 12, 2021, Bradley saw Dina Stock, DPM, for bilateral foot pain.  (Tr. 496–98).
Bradley stated that her foot pain was better at rest and worse when she was on her feet.
(Tr. 496).  Bradley's BMI was 57.57 and X-rays of her feet showed bilateral pes planus,
insertional Achilles, and plantar calcaneal enthesophytes.  (Tr. 498).  Dr. Stock prescribed
custom orthotics, or, alternatively, over-the-counter inserts if the orthotics were not covered by
insurance.  (*Id*.).  Dr. Stock also recommend daily stretching exercises.  (*Id*.).

On July 19, 2021, Bradley reported to Dr. D'Isa that when she slept, she felt like she
stopped breathing, and she was not refreshed after a night of sleep.  (Tr. 622–23).  On
examination, Bradley was alert and oriented.  (Tr. 622).  Her gait was normal, her pulmonary and
chest examinations were normal, and her mood, memory, affect, and judgment were normal.
(*Id*.).  Dr. D'Isa diagnosed Bradley with "other sleep apnea/daytime somnolence" and referred
her to the sleep medicine department.  (Tr. 623).  Dr. D'Isa also referred Bradley to the Eat Well
Program for her morbid obesity.  (*Id*.).

On October 5, 2021, Bradley saw nurse practitioner Robon Vanek at the Sleep Disorders
Center regarding her sleep apnea based on referral from Dr. D'Isa.  (Tr. 585–90).  It was noted
that Bradley also had gastroesophageal reflux disease which could interfere with her sleep.  (Tr.
585).  Bradley was also going to a bed a time when she was not tired, so N.P. Vanek thought she
may need assistance in adjusting her sleep/wake schedule.  (Tr. 589).  N.P. Vanek requested that
Bradley follow up with her after obtaining a sleep study.  (*Id*.).

7

On November 1, 2021, Bradley followed up again with Dr. Hsia reporting constant low back pain, which she rated as an 8 out of 10. (Tr. 548–67). Bradley stated that her pain was worse with standing and walking. (Tr. 548). Dr. Hsia recorded that Bradley was mostly sedentary at home, though she did some housework. (*Id*.). Bradley reported that she was using Aleve for pain because she had run out of Flexeril. (*Id*.). She also stated that her aquatic physical therapy sessions were stopped because of COVID (and due to the passing of her father). (Tr. 548, 557). On examination, Bradley's gait was mildly antalgic and there was a palpable muscle spasm and/or diffuse tenderness of the lumbar region in response to light touch. She had decreased range of motion in the lumbar spine but a negative straight leg raise test. (Tr. 552). Bradley was cooperative in her examination and had normal muscle strength in the lower extremities. (*Id*.). Dr. Hsia prescribed heat patches and Baclofen "as needed" for muscle spasms and again referred her to physical therapy. (*Id*.). Dr. Hsia also, at Bradley's request, provided Bradley with a letter to excuse her attendance from SNAP training classes. (Tr. 571).

### C.      Relevant Opinion Evidence

### 1.      Treating Source Evaluation

On November 1, 2021, Dr. Hsia conducted the above-described medical evaluation of Bradley. (Tr. 548–71). Both the ALJ and Bradley, in her briefing, appear to treat this evaluation as a treating source evaluation for purposes of disability evaluation. Bradley requested a letter to excuse her from a SNAP training session scheduled to start the following week, "due to 9 hours of sitting." (Tr. 548). Dr. Hsia opined that "due to ongoing back issues, [and] chronic pain, patient is unable to sit for snap benefit class." (Tr. 571). He opined that Bradley was limited to lifting 15 pounds and could not perform prolonged standing or repetitive bending. (*Id*.).

### 2.      Consultative Examiner

On February 15, 2021, Dr. Pickholtz conducted a psychological consultative

examination.  (Tr. 454–64).  Dr. Pickholtz reached the following medical opinions in relation to

Bradley's four work-related mental abilities as summarized by the ALJ:

> "(1) the estimated verbal IQ fell within the low average range.  The overall
> capacities to understand, remember, and carry out instructions for simple work
> activities really do not suggest any impairment.   The overall capacities to
> understand, remember, and carry out instructions for more complex work activities
> are slightly impaired at worst; (2) her capacities for attention and concentration
> based upon recall of digits forwards and backwards and solving mathematical
> computational problems fell in the borderline range and the borderline to low
> average ranges.  Her pace appeared to be a little bit slow at times and her persistence
> appeared to be a little bit impeded inasmuch as [Dr. Pickholtz] had to repeat
> questions and directives but not that often.  Her capacities to perform 1 to 2-step
> tasks really do not reflect any significant impairment.  Her overall capacities to
> perform 3 to 4-step tasks are slightly to somewhat impaired and may improve with
> some future psychiatric treatment; (3) the capacities to related to coworkers and
> others based upon presentation, work history, and the description of current levels
> of social interaction and as a result of the possibilities of her social phobia and/or
> avoidant personality disorder is slightly to somewhat impaired at worst and would
> improve with future psychiatric treatment; and (4) the capacities to handle the
> stresses and pressures of work as a result of her current untreated psychiatric
> complaints and conditions and based on her recent work functioning and her daily
> activities are slightly to somewhat impaired at worst and I think would improve
> significantly with future medications and counseling."

(Tr. 29 (citing Tr. 463)).

### 3.      State Agency Consultants

On February 12, 2021, and August 8, 2021, respectively, W. Scott Bolz, MD, and

Elizabeth Das, MD, reviewed the record of Bradley's physical condition at the request of the

state agency.  (Tr. 88–89, 104–05).  Both consultants found that Bradley retained the ability to

perform light exertional work with postural and environmental limitations, as accurately

summarized by the ALJ.  (Tr. 32).

9

On February 27, 2021, and July 22, 2021, respectively, Jenner Swain, PsyD, and
Courtney Zeune, PsyD, reviewed the record of Bradley's psychological condition, also at the
request of the state agency.  (Tr. 78, 86, 101).  Both consultants made the following findings, as
summarized by the ALJ: "[Bradley] has no severe mental impairment; mild limitation in
understanding, remembering, or applying information; mild limitation in interacting with others;
mild limitation in concentrating, persisting, or maintaining pace; and mild limitation in adapting
or managing oneself."  (Tr. 32).

### 4.      Other Evidence

Although there was other evidence in the administrative record, the ALJ expressed that
he did not articulate his consideration of evidence that was inherently not valuable, or persuasive
as permitted under 20 CFR 404.1520b(c) and 416.920b(c).  (Tr. 32).

### D.      Testimonial Evidence

### 1.      Bradley Testimony

Bradley testified that she lived with her mother and that she helped out her mother, who
is in her 70's.  (Tr 48).  Bradley stated that she is 5'3 and weighs approximately 330.  (Tr. 49).
She graduated from high school in 1994.  (Tr. 50).

As to her physical limitations, Bradley testified that in her past employment with the TSA
she would stand for all but 30 minutes of an 8-hour day and would lift up to 75 pounds.  (Tr. 51).
However, she explained that she can no longer perform that type of employment because of
"back issues" which now limit her such that she "can't lift anything."  (Tr. 51).  She testified that
when she attemps to complete chores or housework she can only do a little bit at a time before
she needs to sit down.  (Tr 52).  Bradley stated that she must sit to wash dishes, and she is unable
to vacuum her apartment without needing to sit down due to pain in her back and her feet.  (*Id*.).

She described her physical pain as in her lower back and feet.  (*Id.*).  She stated her pain on a typical day was "[a]ll across [her] lower back."  (*Id.*).  She stated she was in pain "like 12 out of 24" hours in the day.  (Tr. 53).  Without medication Bradley testified that her average pain level was 6 or 7 out of 10, but with medication her pain was 5 out of 10.  (*Id.*).  "[A]t least three times a month," Bradley explained that her lower back pain would travel down through her legs, and that sometimes ("maybe 20 days") out of the month her pain would be above average.  (Tr. 60–61).  Bradley testified that she was able sit for 2 or 3 hours and stand for 3 hours, that she could walk for 50 to 60 feet, and that she could not lift more than 5 or 10 pounds.  (Tr. 54).

As to her mental limitations, Bradley states that she could not drive due to anxiety and panic attacks, so her mother would drive.  (Tr. 50).  She further explained that she did not have difficulty remembering to perform activities such as brushing her teeth, bathing, or taking medication.  (Tr. 54).  She stated that "sometimes" she might have difficulty focusing or following the plot of a story.  (Tr. 55–56).  Bradley testified that she was unable to be around a lot of people because of panic and anxiety attacks, so she stayed at the house most of the time and would only go out for a doctor appointment.  (Tr. 58).  In describing her anxiety and depression, Bradley expressed that she did not see friends or family, apart from her mother, that she did not like crowds, and that she sometimes had trouble getting out of her bedroom.  (Tr. 62).  Bradley stated that she had not talked to a psychiatrist because she hadn't found anyone who takes her insurance.  (Tr. 59).

### 2.    Vocational Expert Testimony

Vocational expert ("VE") David Salwesky also testified.  (Tr. 66–70).  The ALJ posed five hypotheticals.  The VE testified that the jobs available in response to the ALJ's first four hypotheticals would be able to be performed at an SVP of  2.  (Tr. 67–69).  The ALJ's fifth

hypothetical added that the individual would be off task 20% of the time during an eight-hour

day and be absent from work two days per month; in response, the VE stated those limitations

would be work preclusive. (Tr. 69–70). When questioned by Bradley's attorney, the VE

explained that, as for the jobs described in response to the ALJ's fourth hypothetical, it would be

work preclusive if the individual could not have any "sourceful interaction which means that this

person would have to work in isolation[.]" (Tr. 70).

## IV.    Law & Analysis

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is

limited to deciding "whether the ALJ applied the correct legal standards and whether the findings

of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the

relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks

omitted), even if a preponderance of the evidence might support the opposite conclusion.

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). Under the substantial

evidence standard, the court cannot decide the facts anew, evaluate credibility, or reweigh the

evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If the ALJ's

decision is supported by substantial evidence and reasonably drawn from the record, the ALJ's

findings are conclusive, even if this court might reach a different conclusion or if the evidence

could have supported a different conclusion. 42 U.S.C.S. §§ 405(g), 1383(c)(3); *Rogers v.

Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) ("This court's review of the

Commissioner's decision is limited to determining whether it is supported by substantial

evidence and was made pursuant to proper legal standards.") (Citation omitted). Accordingly,

the ALJ enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

However, the ALJ's decision will not be upheld if the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant.  *Rabbers v. Comm's SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision if the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.   Step Four: Analysis of Opinion Evidence

Bradley's first argument is that the ALJ erred in analyzing and ultimately finding unpersuasive Dr. Hsia's opinion that Bradley was unable to perform prolonged sitting, as described in his November 1, 2021, letter excusing her from a SNAP training class.  ECF Doc. 8 at 12.  In support of her argument that "[t]he ALJ's analysis of Dr. Hsia's opinion regarding Ms. Bradley's sitting limitations does not meet the Social Security Administration's requirements for the evaluation of opinion evidence[,]" Bradley cites evidence of her physical condition that she believes supports Dr. Hsia's opinion, including: (i) her record of treatment for back pain, beginning on May 15, 2020, through November 1, 2021; (ii) various x-ray images of her spine which showed "moderate disc space narrowing[;]" and (iii) various medical records from providers in addition to Dr. Hsia.  *Id*. at 12–14.  Specifically, she argues that the ALJ failed to address the regulatory factors of supportability and consistency which, considering the evidence Bradley highlighted in her argument, "deprives this Court and Ms. Bradley of understanding why this evidence was insufficient to support Dr. Hsia's opinion that she would be limited in her sitting ability."  *Id*. at 15.  The Commissioner disagrees.  ECF Doc. 11 at 8–13.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  Under current regulations, the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. § 404.1520c(a).  Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  20 C.F.R. § 404.1520c(b).  In his analysis of a medical source's opinion, the ALJ is required to explain how he considered the supportability and consistency of the source's medical opinion, but generally he is not required to discuss other factors.[2]  20 C.F.R. § 404.1520c(b)(2).  According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied proper legal standards and reached a decision support by substantial evidence in finding unpersuasive the opinion rendered by Dr. Hsia on November 1, 2021.  The ALJ applied governing regulations when he found that:

> Dr. Hsia's medical opinion of being 'unable to sit' is not persuasive because it is not consistent with his notation that the claimant is 'mostly sedentary at home [.]'  However, his medical opinion of no prolonged standing is persuasive even though the claimant has normal muscle strength in the lower extremities[,] based on the combined effect of her impairments including her morbid obesity.

---

[2] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

(Tr. 31).  This paragraph followed several pages of discussion by the ALJ citing Bradley's numerous visits to Dr. Hsia and other providers.  In that discussion, the ALJ cited numerous reports that Bradley was capable of sitting and was generally more comfortable in a seated position.  When the entire decision is considered, the ALJ demonstrated that he properly considered whether Dr. Hsia's opinion was consistent with the findings of other providers, none of which articulated the sitting limitation opined by Dr. Hsia.  Likewise, the whole of the ALJ's decision demonstrates that he ALJ properly considered the supportability of Dr. Hsia's opinion. For example, he highlighted the conflict between Dr. Hsia's opinion that Bradley's was "unable to sit" and his notation that she is "mostly sedentary at home."  (*Id.*).  The court agrees with Bradley that the ALJ's paragraph that discussed Dr. Hsia's opinion could have been more comprehensive and expansive.  But the ALJ's decision cannot be reversed when the entire decision, read with common sense, indicates that the required standards were applied.

Bradley argues that an RFC finding that she could work at the sedentary exertional level is inconsistent with Dr. Hsia's letter, which limited the amount of time that Bradley could sit and stated she could not perform prolonged standing, lift more than 15 pounds, or perform repeated bending.  *See* ECF Doc. 8 at 14 (citing Tr. 535).  However, the ALJ's evaluation of this medical opinion properly identified the letter for what it was: a context-specific statement created, at Bradley's request, to excuse her from specific day-long SNAP training.  (Tr. 30–31).  The context in which Dr. Hsia's statement was made is key.

Additionally, Bradley argues that Dr. Hsia's notation that Bradley was "mostly sedentary" at home cannot form the basis of an RFC sedentary work finding, because the term "sedentary" is a defined term under SSA regulations and because Dr. Hsia's letter stated that Bradley could not sit for 9-hour SNAP training.  ECF Doc. 8 at 14.  The court construes

Bradley's contention to be that the ALJ, in making his RFC findings, should have disregarded Dr. Hsia's use of the term "mostly sedentary" in his November 1, 2021 visit notes, and, instead, should have credited Dr. Hsia's November 1, 2021, letter which indicated Bradley was unable to sit for SNAP training.  I do not find this argument persuasive, because the SSA definition of "sedentary work," which the ALJ would have understood, is not in conflict with Dr. Hsia's letter or the other evidence that the ALJ considered.

As the Commissioner highlights, Dr. Hsia's letter was created for the purpose of excusing Bradley from a 9-hour long SNAP training session.  ECF Doc. 11 at 12.  The 9-hour long, seated class far exceeded the sitting duration of sedentary work, as defined by the SSA.  (*Id*.). "Sedentary work" is work "involving lifting no more than 10 pounds at a time and occasionally lifting or carrying" small objects; thus, "[a]lthough sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties."  SSR 83-10.  The definition also indicates that "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10.  Thus, when the ALJ's decision is viewed as a whole, the ALJ's finding that Bradley could perform sedentary work is not in conflict with Dr. Hsia's letter excusing her from sitting through a 9-hour long training.  Indeed, Dr. Hsia's opinion is silent on whether Bradley could sit for six hours per day with intermittent standing and walking.

On review of the entire ALJ decision, the court finds that the ALJ's articulation of how he considered Dr. Hsia's opinion was sufficient to satisfy the regulatory obligation to analyze the supportability and consistency of the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).  Although not expressed in a single comprehensive paragraph, the ALJ's articulation was sufficient to understand the reasoning behind his conclusion.  The ALJ must discuss significant evidence

supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, but the ALJ need not incorporate all the information he relied on into a single tidy paragraph. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

Moreover, independent review of the record reflects substantial evidence supported the ALJ's sedentary work RFC and his conclusion about the persuasiveness of Dr. Hsia's opinion. A sampling of such evidence includes: (i) Dr. Hsia's notation that Bradley is "mostly sedentary" at home, (Tr. 535); (ii) an annotation in treatment records indicating that Bradley does not stand much, (*see* Tr. 498 (Dr. Stock noted, at an approximately 1:30pm appointment, "she notes hasn't been on feet today so feet don't hurt now – will start when on feet more)); (iii) a statement that she was capable of driving (which necessarily involved sitting) for 13 hours, (Tr. 345); (iv) physical therapists rated her prognosis as "good," should she complete therapy, (Tr. 348–49); (v) she is able to care for herself, take care of daily hygiene, and complete some household chores, (Tr. 460–61); (vi) her own statements that her foot pain began only one or two years ago and that she fractured her foot two years ago, (*e.g.*, Tr. 486, 496); (vii) her own statements that her feet "hurt *sometimes* at home," (Tr. 651) (emphasis added); and (viii) that various providers continually recommend stretching and referred her to physical therapy and other specialists to address her symptoms of back, leg, and foot pain, (*e.g.*, Tr. 498, 653).

When the ALJ's analysis is read as a whole and with common sense, it is apparent that the ALJ made and articulated his findings regarding the persuasiveness of the Dr. Hsia's opinion in compliance with the regulations. *See Buckhanon*, 368 F. App'x 674, 678-79.  Bradley's first assignment of error provides no basis to remand of the Commissioner's final decision.

### C.  Step Four: RFC Findings

Bradley's second assignment of error is related to her first one.  It contends the ALJ's RFC determination was not supported by substantial evidence to the extent that it found her capable of performing the sitting that would be required for sedentary work.  ECF Doc. 8 at 15. And it expressly restated the standards for evaluating opinion evidence and challenged the rejection of Dr. Hsia's opinion.  *Id.*  Bradley further argues, "If an individual cannot perform the sitting requirements of sedentary work and cannot perform the standing and walking requirements of light work, there would be no work available and a finding of disability should have followed."  *Id.* at 17-18.  The second assignment of error also accuses the ALJ of cherry picking evidence in finding that Bradley was not more restricted than the sedentary work standard.  *Id.* at 16.  The Commissioner disagrees.  ECF Doc. 11at 13–18.

Bradley argues the ALJ erred because the treatment records he cited did not accurately capture Bradley's condition, which, she contends, could have been derived from the treatment records the ALJ did not cite.  To this end, she argues that the ALJ's RFC assessment "is premised on a limited an inaccurate review of the record."  ECF Doc. 8 at 17.  The court disagrees that there was a "limited" assessment of the record.  To begin with, the ALJ stated that he gave "careful consideration of the entire record" and "considered all symptoms."  (Tr. 26). These boilerplate statements are borne out in the ALJ's extensive discussion of the medical record. (Tr. 26–32).

 "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp.2d at 881 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010)).  However, the

regulations do not require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports his decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012). ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simmons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'")(quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).  So long as the evidence he did discuss provides substantial evidence in support of his decision, the failure to discuss other evidence that might have led to a disability finding is not error.  As the Sixth Circuit held in *Adams v. Comm'r of Soc. Sec.*, 2023 U.S. App. LEXIS 25863 at *10-11 (6th Cir., Sept. 28, 2023):

> [T]he relevant inquiry is whether substantial evidence supports the ALJ's decision. *See Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" ([Q]uoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

Bradley's argument did not address whether the evidence the ALJ *did* cite provided substantial evidence in support of his findings.  It did.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that in this context "the threshold for such evidentiary sufficiency is not high[]" as it simply requires "more than a mere scintilla") (internal citation omitted).

Specifically, the ALJ found several opinions persuasive, in whole and in part, including, but not limited to: (i) Dr. Hsia's opinion that Bradley could not perform "prolonged standing," (Tr. 31) and (ii) the ALJ's partial acceptance of the state agency consultants' medical findings. Even though the state agency doctors opined that Bradley was capable of "light work" (Tr. 36), the ALJ found that further restrictions were warranted, stating that a: "sedentary [RFC] was supported by the combined effect of the objective medical evidence including the claimant's

19

BMI." (Tr. 36). Additionally, the ALJ provided a sampling of the medical evidence that he considered and which supported his RFC determination, including, but not limited to: (i) X-rays of Bradley's lumbar spine that showed only "mild" and "moderate" lumbar spondylosis; (ii) "generally unremarkable" physical examinations; (iii) that most assessments indicate Bradley's gait was "usually normal or intact;" (iv) that "claimant is obese with BMI's in the upper 50's/low 60's;" and (v) that physical therapy rated Bradley's prognosis as "good due to objective clinical presentation" should she participate in recommended physical therapy sessions. (Tr. 31). This articulation shows that the ALJ's review of the record was not "limited" as Bradley contends. And, for the reasons explained above, the ALJ was entitled to disregard the opinion of Dr. Hsia that Bradley was "unable to sit."

Bradley is critical of the ALJ's indication that the medical records contained several notations that her gait was usually normal or intact. In Bradley's view, when considering the severity of Bradley's back issues, the ALJ should have only looked at the gait findings when Bradley saw doctors for back pain. Bradley cites no law for that proposition, probably because such a view is contrary to law. And it is contrary to Bradley's own argument against cherry-picking the record. An ALJ is fully entitled to see what the records reveal about a claimant's condition at all times, especially medical observations that are made when the claimant is not suspecting that a particular functional limitation is under consideration.

Moreover, "[i]t is for the [ALJ] to resolve conflicts in the evidence and decide questions of credibility." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th 1997). Here, the ALJ identified multiple medical opinions and records which supported his RFC and disability determination. (Tr. 30-33). The ALJ's evaluation of the record evidence, which necessarily required that some evidence be found persuasive at the expense of other evidence, identified much more than a mere

scintilla of evidence in support his decision.  Because Bradley has not challenged the sufficiency of the ALJ's evaluation of the opinions of the state agency doctors, she has implicitly acknowledged that their opinions are evidence the ALJ could have relied upon to make his RFC findings, even though she feels that Dr. Hsia's opinions more accurately characterized her condition.  The ALJ's ability to accept portions of the state agency doctors' opinions negates Bradley's argument that "if an individual cannot perform . . . the standing and walking requirements of light work, there could be no work available and a finding of disability should have followed."  ECF Doc. 8 at 17-18.

Bradley's challenge to the ALJ's RFC findings fails on the merits.

## V.      CONCLUSION

Because the ALJ applied the correct legal standard in evaluating the opinion evidence and because the ALJ's RFC findings were supported by substantial evidence, the Commissioner's final decision denying Bradley's claims for Social Security benefits is AFFIRMED.

**IT IS SO ORDERED.**

Dated: December 8, 2023

Thomas M. Parker
United States Magistrate Judge